# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JENNIFER LEE GREENE,                          :
      Plaintiff,                          :          CIVIL ACTION NO.
                                       :          3:17–cv–01241 (JCH)
      v.                                :
                                         :
NANCY A. BERRYHILL, Acting                     :          AUGUST 10, 2018
Commissioner, Social Security                  :
Administration,                                :
      Defendant.                          :

## RULING RE: MOTION FOR JUDGMENT ON THE PLEADINGS (DOC. NO. 16) & MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER (DOC. NO. 20)

## I.  INTRODUCTION

Plaintiff Jennifer Lee Greene ("Greene") brings this appeal under section 405(g) of title 42 of the United States Code from the final decision of the Commissioner of the Social Security Administration ("SSA"), which denied her application for Title II disability insurance benefits and Title XVI supplemental security income.  See Complaint ("Compl.") (Doc. No. 1).  Greene seeks either reversal or remand of the Decision rendered by Administrative Law Judge ("ALJ") Ronald J. Thomas, which affirmed the Commissioner's denial.  See Mot. for Judgment on the Pleadings ("Mot. to Reverse") (Doc. No. 16).  The Commissioner cross-moves for an order affirming that Decision. See Mot. to Affirm the Decision of the Comm'r ("Mot. to Affirm") (Doc. No. 20).

For the reasons set forth below, the Motion for Judgment on the Pleadings is **GRANTED**.  The Motion to Affirm the Decision of the Commissioner is **DENIED**.

## II.  PROCEDURAL HISTORY

Greene applied for disability insurance benefits on January 5, 2015, and supplemental security income benefits on July 22, 2015, alleging a disability onset date

of November 17, 2013, in both applications.  See R. at 18.  The Commissioner denied

Greene's application initially on May 13, 2015, and again upon reconsideration on

October 29, 2015.  See id.  Greene requested a hearing with an ALJ, which was held

before ALJ Thomas on October 26, 2016.  See id.

On February 22, 2017, ALJ Thomas issued an unfavorable decision for Greene,

affirming the Commissioner's denial and finding that Greene was not disabled.  See id.

at 35–36.  Specifically, ALJ Thomas found that Greene's impairments did not meet or

equal any listing, see id. at 22–25, and that, with her level of residual functional capacity

("RFC"), there were jobs in the national economy that she could perform, see id. at 34–

35.  Greene requested review by the Appeals Council, which denied the request on May

23, 2017.  See Compl. at 2 ¶ 11.  Following that denial, ALJ Thomas's February 22,

2017 Decision became a final decision reviewable by this court.  See R. at 1 (Notice of

Appeals Council Action).  Greene then filed this appeal on July 24, 2017.  See Compl.

**III. FACTS**

The court adopts the facts as stated in the parties' Joint Stipulation of Facts

("Stipulation") (Doc. No. 18), and it will therefore only briefly describe the facts relevant

to this opinion.

Greene was 38 at the time of her hearing in February 2017.  See R. at 400.  She

was last employed as a childcare worker in 2013, when she began experiencing pain

that prevented her from lifting and tending to children.  See id. at 49.  The record in this

case begins in September 2013, when Greene saw Dr. Katherine Kedziersky due to

pain in her head, neck, arms, hands, thighs, calves, and back that she could not trace to

a particular cause and was not responding to physical therapy or medication.  See

Stipulation at 2.  Beginning in January 2014, Greene saw several physician assistants

2

at My Health 1st Urgent Care. <u>See id.</u> at 9–16. On November 10, 2014, Greene began being treated by Dr. John McDougall, a rheumatologist at Yale New Haven Medical Center, for her chronic pain. <u>See id.</u> After Dr. McDougall moved to another hospital in June 2015, Greene established care with Dr. Kofi Mensah, another rheumatologist at Yale New Haven Medical Center, beginning on February 8, 2016. <u>See id.</u> at 6. Drs. McDougall and Mensah both diagnosed Greene with fibromyalgia. <u>See id.</u> at 4, 8.

## IV. STANDARD OF REVIEW

Under section 405(g) of title 42 of the United States Code, it is not a function of the district court to review <u>de novo</u> the ALJ's decision as to whether the claimant was disabled. <u>See Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998). Instead, the court may only set aside an ALJ's determination as to social security disability if the decision "is based upon legal error or is not supported by substantial evidence." <u>Balsamo v. Chater</u>, 142 F.3d 75, 79 (2d Cir. 1998). Substantial evidence requires "more than a mere scintilla," but is a "very deferential standard of review." <u>Brault v. Soc. Sec. Admin., Comm'r</u>, 683 F.3d 443, 447–48 (2d Cir. 2012). It requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Id.</u> at 448. If the Commissioner's findings of fact are supported by substantial evidence, those findings are conclusive, and the court will not substitute its judgment for the Commissioner's. 42 U.S.C. § 405(g) (2016); <u>see also Yancey v. Apfel</u>, 145 F.3d 106, 111 (2d Cir. 1998).

## V. DISCUSSION

Greene argues that ALJ Thomas's decision should be reversed or remanded for three reasons. First, she argues that the ALJ failed to properly apply the treating physician rule to Dr. McDougall's July 2015 opinion and Dr. Mensah's September 2016 opinion. <u>See</u> Mem. of Law in Supp. of Pl.'s Mot. for J. on the Pleadings ("Pl.'s Mem.") at

1–5.  Second, she argues that the ALJ committed legal error when evaluating her symptoms.  See id. at 7–12.  Third, Greene argues that the ALJ's assessment of her Residual Functional Capacity ("RFC") was not supported by substantial evidence.  See id. at 5–6.

A.    Treating Physician Rule

SSA regulations give the opinions of treating physicians "controlling weight," so long as those opinions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in . . . [the] record."  20 C.F.R. § 416.927(c)(2);[1] see also Lesterhuis v. Colvin, 805 F.3d 83, 88 (2d Cir. 2015).  In other words, "the SSA recognizes a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant."  Burgess v. Astrue, 537 F.3d 117, 128 (2d Cir. 2008) (quoting Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003)).  "Even if the treating physician's opinion is contradicted by other substantial evidence, and so is not controlling, it may still be entitled to significant weight 'because the treating source is inherently more familiar with a claimant's medical condition than are other sources.'" Tankisi v. Comm'r of Social Sec., 521 F. App'x 29, 33 (2d Cir. 2013) (Summary Order) (quoting Schisler v. Bowen, 851 F.2d 43, 47 (2d Cir. 1988)).

The ALJ declined to give controlling weight to either Dr. McDougall or Dr. Mensah's medical source statements.  See R. at 32–33.  Greene argues that the ALJ erred by rejecting specific physical limitations described by Greene's treating

---

[1] The Regulation has been amended, but the amended version does not apply to this case, which was filed before the new medical evidence rules became effective on March 27, 2017.  See 82 Fed. Reg. 5,844 (Jan. 18, 2017), 2017 WL 168819.

rheumatologists and instead relying on a letter Dr. McDougall wrote to Greene's counsel several months after his first opinion in which he made the vague statement that Greene could perform light duty work.  See Pl.'s Mem. at 2.  She also argues that the ALJ failed to assess the factors he was obligated to consider when assigning value to the medical opinions short of controlling weight.  See id. at 4.  The Commissioner argues that, after reviewing the medical record to reconcile the inconsistency between Dr. McDougall's two medical opinions, the ALJ properly found that, apart from Dr. McDougall's letter, the medical opinions were not supported by the record.  See Def.'s Mem. in Supp. of Her Mot. for an Order Affirming the Feb. 22, 2017 Final Decision Pursuant to 42 U.S.C. § 405(g) ("Def.'s Mem.") (Doc. No. 20) at 3–6.

### 1.  Dr. McDougall's Opinions

On July 28, 2015, Dr. McDougall completed a fibromyalgia questionnaire regarding Greene's condition.  See R. at 641–45.  Dr. McDougall indicated that Greene had "widespread pain or a history of widespread pain in all quadrants of the body that has persisted for at least 3 months" and had tender points in her shoulders, elbows, hips, knees, and chest.  R. at 642.  He noted that Greene experiences chronic pain in her chest, lower back, shoulder girdles, upper and lower arms, upper legs, and hips.  See id.  He also observed that Greene had several symptoms, signs, or co-occurring conditions of fibromyalgia, including "fibro fog," poor memory, depression, nervousness, chest pains, fatigue/tiredness, waking unrefreshed, and muscle weakness.  See id.

Dr. McDougall opined that, in an eight-hour workday, Greene could perform a job in a seated position for three to four hours and perform a job standing and/or walking for one to two hours.  See R. at 644.  He noted that it was medically necessary for Greene

to avoid continuous sitting in an eight-hour workday, and that she must get up from a seated position to move around for five minutes every 60 to 90 minutes.  See id.  Dr. McDougall indicated that Greene can occasionally lift or carry up to 10 pounds and that she does not have significant limitations in reaching, handling, or fingering.  See id.  He noted that Greene's symptoms would likely increase if she were placed in a competitive work environment because emotional duress is likely to exacerbate her symptoms.  See R. at 645.  In an average eight-hour workday, Green's experience of pain, fatigue, or other symptoms would frequently be severe enough to interfere with attention and concentration.  See id.  In addition, Greene would have to take one or two unscheduled breaks at unpredictable times during an eight-hour workday that would last for an average of five minutes.  See id.  Dr. McDougall opined that, on average, Greene is likely to be absent from work as a result of her impairments or treatment two to three times a month.  See id.  Under a section marked "Additional comments," Dr. McDougall wrote, "[a]ll values included are estimates and based on my own experience with this patient.  For a thorough, comprehensive evaluation I recommend a consult to occupational medicine."  R. at 645.

In January 2016, at the request of Greene's counsel, Dr. McDougall wrote a letter regarding Greene's disability claim.  See R. at 746–47.  Dr. McDougall wrote:

> While Mrs. Greene's pain was poorly controlled by our medication trials, there were never any medical limitations to her participation in light duty work.  Easy stretching, gradual introduction of activities, good sleep hygiene, and generally not 'overdoing it' were some of the therapies discussed as ways of managing her disease.

R. at 747.

6

The ALJ afforded Dr. McDougall's July 2015 fibromyalgia questionnaire "some weight." R. at 32. In support of his determination, the ALJ noted that Dr. McDougall advised that the restrictions he indicated were "estimates only" and suggested obtaining a comprehensive occupational medicine evaluation to arrive at an adequate assessment. See id. The ALJ then stated that he did not accept that Greene would be absent from work two to three times a month. See id. He also noted that "Dr. McDougall admitted not seeing the claimant since June 2014." Id. Finally, the ALJ gave "great weight" to Dr. McDougall's January 2016 letter stating that Greene could perform light duty work "given the time the treating physician saw the claimant and other treating sources records that support the claimant can do some work." Id. The ALJ determined that Greene could not do light work, but "given Dr. McDougall recommendations for easy stretching and gradual introduction to work" in the January 2016 letter, the ALJ found that Greene can do work at the sedentary level of exertion. Id.

The court concludes that the ALJ's decision to deny controlling weight to Dr. McDougall's July 2015 opinion is unsupported by substantial evidence. First, the ALJ erred by placing undue emphasis on Dr. McDougall's comment that his responses were "estimates only" and that a consult to occupational medicine would allow for a more thorough and comprehensive evaluation. See R. at 32. The Regulations contain no requirement that a treating physician possess expertise in occupational medicine in order to render an opinion, and the ALJ did not explain how Dr. McDougall's acknowledgement that the limitations he assessed were "estimates" distinguishes his findings from those of any other treating physician. Indeed, given his specialty in

rheumatology, Dr. McDougall was well-qualified to opine on the effects of Greene's fibromyalgia.  See Green-Younger, 335 F.3d at 107 (citing the American College of Rheumatology guidelines for diagnosing fibromyalgia).  In the very same "additional comments" section, Dr. McDougall stated that his findings were "based on my experience with this patient."  R. at 645.  This comment was the only part of the additional comments section relevant to an evaluation of Dr. McDougall's opinion; the ALJ should have then assessed whether Dr. McDougall's opinion was in fact an accurate reflection of his treatment of Greene.  See 20 C.F.R. § 404.1527 (directing the ALJ to give a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record).

Second, among his reasons for only affording Dr. McDougall's July 2015 opinion "some weight," the ALJ noted that, "Dr. McDougall admitted not seeing the claimant since June 2014."  R. at 32.  Given that the fibromyalgia questionnaire was dated July 28, 2015—over a year later—the ALJ presumably believed that Dr. McDougall's opinion was less accurate than if he had seen Greene more recently.  However, the date Dr. McDougall provided for Greene's most recent exam—6/17/2014—was clearly intended to be 6/17/2015.  See R. at 641.  In the line immediately above the date of most recent treatment, Dr. McDougall wrote that the date of first treatment was 11/20/2014.  See id. It would have been impossible for the "date of first treatment" to have taken place after the "date of most recent exam."  Moreover, a treatment note from June 17, 2015, is included in the record, see R. at 748–51, and is discussed by the ALJ in an earlier section of his Decision, see R. at 28.  Thus, it appears that a misunderstanding about

the length of time since Dr. McDougall treated Greene contributed to the ALJ's determination that the July 2015 opinion was only entitled to "some weight."

The ALJ assigned "great weight" to the next treating source statement: a letter Dr. McDougall sent to Greene's counsel at his request in January 2016 in which Dr. McDougall wrote that "there were never any medical limitations to [Greene's] participation in light duty work." R. at 32. However, unlike the July 2015 fibromyalgia questionnaire, the January 2016 letter did not include answers to specific questions regarding Greene's occupational limitations. See R. at 746–47. Consequently, it is not clear what Dr. McDougall meant by his determination that Greene could perform "light duty work." Dr. McDougall's conclusion is especially ambiguous in view of his prior medical opinion, in which he opined that Greene could remain in a seated position for no more than three to four hours, could remain standing for no more than one to two hours, could not lift or carry greater than 10 pounds occasionally, and would likely be absent from work two to three times per month. See R. at 644–45. These restrictions are inconsistent with the ability to perform light work as defined by the SSA. See 20 C.F.R. § 404.1567(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of object weight up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."); see also Michaels v. Colvin, 621 F. App'x 35, 40 (2d Cir. 2015) (finding that ALJ's finding that claimant could perform light work was not supported by substantial evidence).

Although the ALJ did not accept that Greene could participate in light work, he determined that, "given Dr. McDougall's recommendations for easy stretching and gradual introduction to work," Greene could perform sedentary work.  R. at 32. However, contrary to the ALJ's characterization of Dr. McDougall's conclusions, Dr. McDougall recommended "gradual introduction of <u>activities</u>," R. at 747 (emphasis added), not "gradual introduction to <u>work</u>," R. at 32 (emphasis added).  Thus, the only support in Dr. McDougall's letter for the ALJ's determination that Greene could engage in sedentary work is a recommended treatment of exercise, which courts have recognized is a common treatment for fibromyalgia, even for patients for whom the disease is disabling.  <u>See</u> <u>Johnson v. Astrue</u>, 597 F.3d 409, 412 (1st Cir. 2009) (recognizing that prescription of physical therapy and aerobic exercise is the appropriate treatment for fibromyalgia and was not inconsistent with treating physician's opinion regarding claimant's limited physical abilities); <u>Rogers v. Comm'r of Soc. Sec.</u>, 486 F.3d 234, 249 (6th Cir. 2007) (noting that "[claimant's] own treating physicians also recommended that she remain as active as possible, yet this did not alter their opinions as to her functional limitations and work restrictions.").

Finally, there is no indication in the record regarding what may have led Dr. McDougall to believe that Greene had improved since his first opinion or to reassess his earlier findings.  Dr. McDougall did not treat Greene in the period between the July 2015 fibromyalgia questionnaire and the January 2016 letter.  Before giving "great weight" to a second opinion that, without explanation or a record reflecting intervening patient visits, appears to contradict a more detailed prior opinion, the ALJ should have contacted Dr. McDougall to clarify the inconsistency between his two opinions.  <u>See</u>

10

Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (noting that before relying on a

"remarkably vague" treating physician's opinion that contradicted claimant's testimony,

"[a]t a minimum, the ALJ likely should have contacted [the treating physician] and

sought clarification of his report."); Cammy v. Colvin, No. 12-CV-5810 (KAM), 2015 WL

6029187, at *16 (E.D.N.Y. Oct. 15, 2015) (remanding because the ALJ failed to seek

additional information from the treating physicians to clarify inconsistencies); Gabrielsen

v. Colvin, No. 12-CV-5694 (KMK) (PED), 2015 WL 4597548, at *7 (S.D.N.Y. July 30,

2015) (finding that the ALJ had the obligation to re-contact the treating physician to seek

clarifying information given the treating physician's unique position to resolve certain

inconsistencies); Rysztenyk v. Astrue, No. 12-CV-2431 (SLT), 2014 WL 2986700, at *11

(E.D.N.Y. July 1, 2014) (remanding where the ALJ made no attempt to clarify the

inconsistency between the treating physician's treatment notes and his source

statement).

Because the ALJ relied on reasons for declining to afford controlling weight to Dr.

McDougall's July 2015 opinion that conflicted with the Regulations or were factually

incorrect, the court concludes that the ALJ misapplied the treated physician rule.

### 2. Dr. Mensah's Opinions

Greene's second treating physician, Dr. Mensah, prepared two treating source

statements. First, in a progress note on June 28, 2016, Dr. Mensah wrote, "PT meets

criteria based on wide-spread pain index and symptom-severity index scores being very

high. Pt has considerable limitations in all physical domains and cannot lift objects or sit

for long periods of time." R. at 877. Then, on September 15, 2016, Dr. Mensah

completed a fibromyalgia questionnaire. See R. at 892–96. Like Dr. McDougall, Dr.

Mensah opined that Greene had "widespread pain or a history of widespread pain in all quadrants of the body that has persisted for at least 3 months" and tender points in her deltoids, forearms, wrists, proximal lateral and anterior thighs, anterior shins, calves, and paraspinal muscles.  R. at 893.  Dr. Mensah indicated that Greene experiences chronic pain in her neck, lower and upper back, upper arms, and lower and upper legs. See id.  He noted that Greene had multiple fibromyalgia symptoms, signs, or co-occurring conditions, including difficulty thinking, depression, dizziness, dry mouth, fatigue/tiredness, insomnia, dry eyes, ringing in ears, headache, heartburn, loss of appetite, muscle weakness, hair loss, rash, numbness/tingling, and shortness of breath. See id.

Beside many of the markings in the section of the questionnaire addressing occupational limitations, Dr. Mensah wrote "PT REPORTED."  R. at 895–96.  Dr. Mensah indicated that, according to Greene, Greene could perform a job in a seated position for less than one hour and a job standing and/or walking for less than one hour. See R. at 895.  He opined that it is medically necessary for Greene to avoid continuous sitting in an eight-hour workday and that, according to Greene, she had to get up from a seated position to move around for five minutes every five minutes.  See id.  Dr. Mensah indicated that Greene reported to him that every five minutes she would need to take unscheduled five-minute breaks to rest during an eight-hour workday.  See R. at 896.

Other responses did not have the annotation "PT REPORTED."  Dr. Mensah opined that Greene could occasionally lift or carry up to five pounds.  See id.  He indicated that Greene did not have significant limitations in reaching, handling, or

fingering, but that she could only occasionally grasp, turn, and twist objects; use her hands or fingers for fine manipulations; and use her arms for reaching, including overhead.  See id.  He observed that, "opening bottles are [sic] difficult."  Id.  Dr. Mensah also found that Greene's symptoms would likely increase if she were placed in a competitive work environment, but that, in an average eight-hour workday, Greene's experience of pain, fatigue, or other symptoms would rarely be severe enough to interfere with attention and concentration.  See R. at 896.  Finally, Dr. Mensah predicted that, on average, Greene would likely be absent from work as a result of her impairments or treatment more than three times a month.  See id.

The ALJ gave the June 2016 note and the September 2016 fibromyalgia questionnaire "little weight."  R. at 32.  Regarding the June 2016 note, the ALJ observed that Dr. Mensah's findings "are not consistent with treatment notes and objective findings."  R. at 33.  The ALJ reasoned that the conservative treatment with physical therapy that Dr. Mensah prescribed was inconsistent with Greene's claims of debilitating pain.  See id.  Also, while Dr. Mensah noted tenderness at the June 2016 examination, Greene presented no evidence of swelling, had full range of motion, walked with a normal gait, and had no motor or sensory deficits.  See id.  With respect to the September 2016 questionnaire, the ALJ wrote that "Dr. Mensah opined that the claimant has had debilitating symptoms since May 1, 2013; however, the treating physician advises that the claimant was first treated in February 2016."  Id.  He also noted that "Dr. Mensah's opinion is based on the claimant's statements, rather than objective findings."  Id.

The court concludes that the ALJ applied an incorrect legal standard when he found that Dr. Mensah's June 2016 note was not supported by the record.  First, the ALJ erred by finding that Dr. Mensah's observations regarding the lack of several objective indicia of pain were inconsistent with his opinion regarding Greene's limitations.  See R. at 32–33.  As the Second Circuit has recognized, for claimants suffering from fibromyalgia, "physical examinations will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions."  Green-Younger, 335 F.3d at 108–09 (quoting Lisa v. Sec. of the Dep't of Health and Human Servs., 940 F.2d 40, 44 (2d Cir. 1991)).  "These negative findings simply confirm a diagnosis of fibromyalgia by a process of exclusion, eliminating 'other medical conditions which may manifest fibrositis-like symptoms of musculoskeletal pain, stiffness, and fatigue.'"  Id. (quoting Preston v. Sec. of Health and Human Servs., 854 F.2d 815, 819 (6th Cir. 1988)).

Unlike most physical impairments, which must be supported by "medical signs and laboratory findings," 20 C.F.R. § 404.1529(a), because it eludes measurement with objective evidence, fibromyalgia may be substantiated through a doctor's diagnoses based on the traditional clinical signs and symptoms and a claimant's subjective complaints of pain, see Green-Younger, 335 F.3d at 107–08 (overturning ALJ's decision where the ALJ "misapplied SSA regulations" by, inter alia "requiring objective evidence beyond the clinical findings for a diagnosis of fibromyalgia under established medical guidelines."); Lim v. Colvin, 243 F. Supp. 3d 307, 317 (E.D.N.Y. 2017) (remanding for further proceedings applying the proper legal standard where ALJ erred by relying on objective and physical examinations rather than the clinical evidence supporting

14

plaintiff's diagnosis of fibromyalgia and her subjective complaints of pain). Dr. Mensah's treatment notes recorded Greene's experience of chronic pain throughout her body. On February 8, 2016, Dr. Mensah noted that, since her last visit to Yale New Haven Medical Center in June 2015, Greene had continued to have "widespread body pain," including "severe" left shoulder pain, neck pain, and back pain, which she ranked an eight out of ten. R. at 859. On May 9 and June 28, 2016, Dr. Mensah indicated that Greene continued to endure pain and fatigue, as well as "considerable psychosocial stress." See R. at 868, 873. In emphasizing the lack of objective evidence to the exclusion of Greene's complaints of pain at her visits and the Dr. Mensah's recognition of clinical signs of fibromyalgia, the ALJ applied the incorrect legal standard for reviewing the medical evidence of fibromyalgia. See Green-Younger, 335 F.3d at 106.

Second, apart from the ALJ's review of the treatment notes and objective findings, Dr. Mensah's conservative treatment of Greene was the sole reason for the ALJ's determination that the June 2016 opinion was inconsistent with the record. See R. at 32–33. However, the ALJ could not discount Dr. Mensah's opinion "merely because he has recommended a conservative treatment regimen." Burgess, 537 F.3d at 129. When viewed in combination with "other substantial evidence in the record, such as the opinions of other examining physicians and a negative MRI," a conservative treatment regimen may support an ALJ's determination that a claimant is not disabled. Id. Here, by contrast, given the error in the ALJ's reliance on several negative findings regarding Greene's physical condition, the conservative treatment regimen stood alone as the only reason supporting the ALJ's determination that Dr. Mensah's June 2016 opinion was inconsistent with the record. Thus, the ALJ's decision not to give

controlling weight to Dr. Mensah's June 2016 opinion was not supported by substantial evidence.

Even though treating physicians' measurements of limitations due to fibromyalgia are necessarily based on a claimant's subjective reporting of pain, the physician still must exercise his medical judgment when translating a claimant's subjective experience into her capacity to perform various work functions. Here, it appears likely that, rather than utilizing his expertise to evaluate Greene's symptoms, Dr. Mensah yielded his responsibility to assess Greene's level of impairment to Greene herself. See Prince v. Berryhill, 304 F. Supp. 3d 281, 288 (D. Conn. 2018) ("It is not apparent whether, in completing the treating source statement, Dr. Samma drew upon any of his experience or ability to interpret [the claimant's] symptoms or test results, or if he was simply a scribe for [the claimant]."). At the end of his June 2016 note regarding Greene's limitations, Dr. Mensah wrote "[s]ee questionnaire for SSI . . . for more details." R. at 877.[2] In that questionnaire, next to many of the metrics for work ability that Dr. Mensah selected, he wrote 'PT REPORTED." R. at 895–96. Before dispensing with Dr. Mensah's opinion on account of its overreliance on Greene's assessment of her own abilities, the ALJ should have re-contacted Dr. Mensah to request clarification of whether "PT REPORTED" indicated that, in stating his medical opinions, Dr. Mensah relied on Greene's subjective complaints, as is appropriate for a patient suffering from fibromyalgia, or whether, in effect, he handed his pen over to Greene for her to answer

---

[2] The only questionnaire in the record completed by Dr. Mensah is dated September 15, 2016. See R. at 892–96. The court assumes that Dr. Mensah's reference to a questionnaire in June 2016 was in anticipation of the one that he ultimately dated September 15, 2016. However, on remand, the court recommends that the ALJ clarify this discrepancy in dates to see whether Dr. Mensah completed an additional questionnaire in June 2016.

the questions directly.  See Selian, 708 F.3d at 421 (noting that before relying on a "remarkably vague" treating physician's opinion that contradicted claimant's testimony, "[a]t a minimum, the ALJ likely should have contacted [the treating physician] and sought clarification of his report.").  On remand, the ALJ should request that Dr. Mensah, if available, clarify the basis for his findings regarding Greene's limitations.

After finding that Dr. McDougall and Dr. Mensah's opinions were not entitled to controlling weight, the ALJ was required to consider several additional factors before assigning a value to the opinions.  See Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004) (the ALJ must "comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.")  However, the ALJ did not properly analyze how various factors, such as the length of the physicians' treating relationship with Greene or their specialization in rheumatology bore on the weight he gave their reports.  See 20 C.F.R. § 404.1527(c) (listing factors including (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion).  On remand, if the ALJ continues to conclude that the treating physicians' opinions should not be given controlling weight, the ALJ should apply the factors to be considered.

   B.    Evaluation of Subjective Symptoms

When determining a claimant's RFC, the ALJ is "required to take the claimant's reports of pain and other limitations into account, but is not required to accept the

claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citations omitted). The ALJ must follow the two-step process set forth in the regulations for evaluating a claimant's assertions of pain and other limitations. See id. "At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged." Id. (citing 20 C.F.R. § 404.1529(b)). Second, "the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' in the record." Id. (quoting 20 C.F.R. § 404.1529(a)).

At the first step, the ALJ found that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. at 27. However, at the second step, the ALJ determined that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." Id.

Greene argues that the ALJ erred by discrediting her testimony on the basis of her conservative treatment regimen; a perceived inconsistency in her account of a driving accident; the ALJ's interpretation of her activities of daily living; the lack of limitations doctors placed on her activity; and her appearance at the hearing. See Pl.'s Mem. at 8–12. The Commissioner argues that the considerations the ALJ relied on when assessing Greene's subjective complaints of pain were proper. See Def.'s Mem. at 7–9.

The ALJ observed that, "despite the complaints of allegedly disabling symptoms," Greene was not attending physical therapy, R. at 28, and had "testified that she was not taking any prescribed medications including pain medication at the time of the hearing," R. at 26.  The ALJ noted that, during a July 2014 examination with treating provider Max Roberts, APRN, Greene stated that she had been "thrown out" of prior pain management treatment.  R. at 28.  In addition, the ALJ observed that there have been significant periods of time since the alleged onset date when Greene has not taken any medications for her symptoms.  Id.  Finally, the ALJ stated that, in October 2014, Greene admitted to treating provider Parimal Patel, PA-C, that she had not gone to prescribed physical therapy treatment despite increased pain all over.  See R.at 28.

Greene's lack of physical therapy or medications at the time of the hearing and during other periods in the time since her alleged onset of disability may be highly probative of whether her pain is debilitating.  However, before arriving at a conclusion on the basis of Greene's treatment, or noncompliance with treatment, the ALJ was required to apply SSR 16-3p.  See Prince, 304 F. Supp. 3d at 291–92 (noting the ALJ's failure to apply SSR 96-7p, the precursor to SSR 16-3p, when evaluating claimant's credibility).  Under SSR 16-3p, an ALJ may find that a claimant's symptoms are not as intense or persistent as alleged "if the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms."  SSR 16-3p, 2017 WL 5180304, at *9.  Before drawing an inference, the ALJ must consider "possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints."  Id.  In considering possible explanations, the

ALJ may need to ask the claimant why she "has not complied with or sought treatment in a manner consistent with his or her complaints." Id.

At the hearing, the ALJ failed to elicit Greene's possible reasons for instances of noncompliance with treatment, and the explanations that did emerge at the hearing did not enter the ALJ's analysis in his Decision. Greene testified that she stopped taking two medications for fibromyalgia, Gabapentin and Cymbalta, because they were not helping her. See R. at 62. Greene also testified that none of her prescription medications helped with her symptoms. See R. at 63. However, the ALJ did not expressly consider the reason Greene provided for why she was no longer taking several pain medications she had already tried. In addition, Greene testified that she had been on a waiting list to see a pain management specialist since January 2016, but that she had an upcoming appointment to see a pain management specialist on November 3, 2016. See R. at 63–64. Despite this testimony, the ALJ did not discuss the reason why Greene has not seen a pain management specialist, and the record does not contain evidence from any appointment.

Further, the ALJ relied on a treatment note from Max Roberts at My Health 1st Medical Care that quoted Greene as saying that she was "thrown out" of a pain management program. R. at 28 (quoting R. at 693). However, the ALJ did not provide Greene the opportunity to explain what she meant when she said she was "thrown out." Finally, at a visit with Dr. Mensah, Greene stated that she was not able to attend physical therapy because of the distance from her home, see R. at 826, but neither the ALJ nor Greene's attorney asked Greene why she did not attend physical therapy, and there is no information in the record regarding whether she subsequently began

physical therapy at an accessible location.  On remand, it is recommended that the ALJ consider Greene's explanations for her failure to engage in a more aggressive treatment regimen.

The ALJ also failed to observe the requirement in SSR 16-3p that an adjudicator confine his review to the impairments that are the subject of a claimant's disability claim. See SSR 16-3p ("Adjudicators must limit their evaluation to the individual's statements about his or her symptoms and the evidence in the record that is relevant to the individual's impairments.").  In his Decision, the ALJ determined that "several inconsistent statements" Greene made regarding a motor vehicle accident she sustained in August 2015 "diminish the persuasiveness of her subjective complaints and alleged functional limitations."  R. at 29.  First, the ALJ noted that, while at the administrative hearing Greene testified that she had never had a driver's license, a treatment note from Dr. Michael Wong at Multicare Medical Center stated that Greene was the "restrained driver" in a car that was hit on the rear.  R. at 906.  Second, the ALJ noted that, despite complaints of "severe neck and paraspinal muscle pain," Dr. Wong diagnosed Greene with a neck sprain/strain, thoracic back sprain, acromioclavicular sprain, wrist sprain, and prescribed conservative treatment.  See R. at 29.

Neither of Greene's statements are related to the impairment underlying her disability claim.  Rather, the ALJ presumably considered Greene's potentially inconsistent statements regarding her driving and her neck pain in order to assess her character and her propensity for describing her pain accurately.  However, SSR 16-3p, which guides ALJ's evaluation of claimants' subjective symptoms, eliminated the use of the term "credibility" and clarified that, when evaluating a claimant's subjective

symptoms, adjudicators may not "assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation." SSR 16-3p. The ALJ erred by viewing Greene's subjective complaints as less persuasive on account of her statements following her motor vehicle accident. See id.

The ALJ also pointed to the lack of limitations Greene's physicians placed on her activities and Greene's activities of daily living as undermining Greene's claim of debilitating symptoms. See R. at 29. However, both determinations constitute misunderstanding or distortions of the evidence. First, as discussed above, attempting to increase physical activity is a common treatment for fibromyalgia. See supra, at 10. Second, the only daily activities the ALJ mentioned in support of his determination that Greene's pain was not as debilitating as alleged was that Green was "capable of caring for herself and two children" and that she is "capable of making simple meals." R. at 30–31. However, the ALJ fails to explain how these activities evidence the ability to perform full-time sedentary work. See Brown v. Comm'r of Soc. Sec., No. 06-CV-3174 (ENV) (MDG), 2011 WL 1004696, at *5 (E.D.N.Y. Mar. 18, 2011) ("[T]here is no indication in the ALJ's decision that the Commissioner was required to reckon how [the claimant's] occasional outings, relationship with a girlfriend, and episodic driving add up to an ability to sit upright for six hours every workday as required by SSA regulations."). The ALJ failed to contend with Greene's testimony that she lies in bed 22 to 23 hours a day and that her children do most of the housework for her. See R. at 55–56.

Finally, Greene argues that the ALJ improperly subjected her to what is known as the "sit and squirm" index by making a medical judgment based on the way she presented at the hearing. See Pl.'s Mem. at 12. While the sit and squirm index has

been strongly discouraged within the Circuit, "there is no per se legal error where the ALJ considers physical demeanor as one of several factors in evaluating credibility" and assigns his observations only limited weight.  Branca v. Comm'r of Soc. Sec., No. 12-CV-643 (JFB), 2013 WL 5274310, at *14 (E.D.N.Y. Sept. 18, 2013) (quoting Schaal, 214 F.3d at 502).  Because the court is remanding on other grounds, and the ALJ's observations at the hearing related to claimant's depression, not the physical limitations central to the arguments in Greene's appeal, the court need not determine whether the ALJ's reliance on Greene's demeanor at the hearing constituted legal error.

     C.    <u>Substantial Evidence</u>

Greene argues that the RFC the ALJ assessed is unsupported by substantial evidence because the only medical opinion the ALJ relied on—Dr. McDougall's January 2016 letter—was overly vague, and the ALJ did not base his determination that Greene could perform sedentary work on specific medical findings or other persuasive non-medical evidence.  See Pl.'s Mem. at 5.  The Commissioner argues that the ALJ's RFC was appropriately based on the record as a whole even though it did not track a particular medical opinion.  Def.'s Mem. at 6–7.

The court concludes that the ALJ's RFC assessment was not based on substantial evidence.  Apart from Dr. McDougall's letter from January 2016, the ALJ did not credit any medical opinions related to Greene's fibromyalgia.  The ALJ gave Dr. McDougall's July 2015 opinion and Dr. Mensah's June 2016 and September 2016 opinions "little weight."  See R. at 32–33.  Although the ALJ gave psychological examining physician Dr. Franklin-Zitzkat's March 2015 psychological consultative examination and the October 2015 opinion of State Agency psychological consultant

Janine Swanson, Psy.D D., partial weight, both opinions related to the effects of Greene's affective disorder and anxiety disorder, as opposed to the physical limitations that underlie the instant appeal.  See id.  Lastly, the ALJ gave partial weight to the opinions of State agency medical consultants' Virginia H. Rittner, M.D. and Abraham Bernstein, M.D. that Greene's scleroderma and Lyme disease were non-severe, but did not accept their finding that Greene's fibromyalgia, degenerative disc disease, and obesity were non-severe.  See R. at 22.  While the ALJ referenced Dr. McDougall and Dr. Mensah's treatment notes, as discussed above, he applied the wrong standard for evaluating evidence of fibromyalgia in the treating physicians' opinions and treatment notes.  See supra, at 13–15.

Because the ALJ's RFC determination was not supported by the medical opinions or medical record, the court concludes that the ALJ committed legal error by substituting his own opinion for that of Greene's physicians.  See Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) ("In the absence of a medical opinion to support the ALJ's finding as to [claimant's] ability to perform sedentary work, it is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (internal citations and quotation marks omitted); Staggers v. Colvin, No. 3:14-CV-717 (JCH), 2015 WL 4751123, at *2–3 (D. Conn. Aug. 11, 2015) (holding that the ALJ "improperly substituted his opinion for that of a physician.").

## VI. CONCLUSION

For the reasons stated above, the Motion for Judgment on the Pleadings is **GRANTED**, and the Motion for Order Affirming the Decision of the Commissioner is **DENIED**.  The case is remanded to the ALJ for proceedings consistent with this Ruling. The Clerk's Office is instructed that, if any party appeals to this court the decision made

after this remand, any subsequent social security appeal is to be assigned to the District

Judge who issued this Ruling.

**SO ORDERED.**

Dated at New Haven, Connecticut this 10th day of August, 2018.

/s/ Janet C. Hall
Janet C. Hall
United States District Judge